**In re TCW/DW NORTH AMERICAN GOVERNMENT INCOME TRUST SECURITIES LITIGATION.**

**No. 95 Civ. 0167 (PKL).**

United States District Court, S.D. New York.

May 8, 1996.

Opinion Denying Reconsideration and Amending Decision Aug. 27, 1996.

Wolf, Popper, Ross, Wolf & Jones, L.L.P., New York City (Robert M. Kornreich and Robert C. Finkel, of counsel), Lead Counsel and Chairman of the Executive Committee of Plaintiffs' Counsel.

Wolf, Haldenstein, Adler, Freeman & Herz, L.L.P., New York City (Daniel W. Krasner, of counsel), Christopher Lovell, P.C., New York City (Christopher Lovell, of

counsel), Burt & Pucillo, West Palm Beach, FL (Michael J. Pucillo, of counsel), Post, Kirby, Noonan & Sweat, San Diego, CA (Michael L. Kirby, of counsel), Elwood S. Simon & Associates, P.C., Birmingham, MI (Elwood S. Simon, John P. Zuccarini, and Michael G. Wassmann, of counsel), Members of the Executive Committee of Plaintiffs' Counsel.

Krause & Kalfayen, San Diego, CA (James C. Krause, of counsel), Wechsler, Skirnick, Harwood, Halebian & Feffer, L.L.P., New York City (Robert A. Skirnick, of counsel), Garwin, Bronzaft, Gerstein & Fisher, L.L.P., New York City (Bruce E. Gerstein, of counsel), Cohn, Lifland, Pearlman, Herrmann & Knopf, Saddle Brook, NJ (Jeffrey Herrmann, of counsel), and Weiss & Yourman, Los Angeles, CA (Kevin Yourman, of counsel), for Plaintiffs.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City (Martin London and Richard A. Rosen, of counsel) for Defendants Dean Witter Distributors Inc., Dean Witter Intercapital Inc., Dean Witter Reynolds Inc., Sheldon Curtis, Robert A. Day, Richard M. DeMartini, Charles A. Fiumefreddo, Thomas F. Caloia and Thomas E. Larkin, Jr.

Gordon, Altman, Butowsky, Weitzen, Shavlov & Wein, New York City (Michael B. Reuben, of counsel), for Defendants TCW/DW North American Government Income Trust, John C. Argue, John R. Haire, Dr. Manuel H. Johnson, Paul Kolton, Michael E. Nugent and David S. Tappan, Jr.

O'Melveny & Meyers, New York City (Martin Glenn and Alan Cohen, of counsel), for Defendant TCW Funds Management, Inc.

## OPINION

LEISURE, District Judge:

This proposed class action arises out of plaintiffs' purchase of shares in TCW/DW North American Government Income Trust (the "Fund"). Plaintiffs claim that through various registration statements, prospectuses, sales materials, annual and semiannual reports, as well as oral statements of brokers and representatives of defendant Dean Witter Reynolds, Inc. ("DWR"), all defendants misrepresented the risks inherent in the Fund, in violation of Sections 11 and 12(2) and of the Securities Act of 1933 (the "Securities Act"). See 15 U.S.C. §§ 77k and 77l(2). In addition, plaintiffs assert that all defendants except the Fund, by virtue of these misrepresentations, violated § 15 of the Securities Act. See 15 U.S.C. § 77o. Finally, Count IV of the Consolidated Class Action Complaint (the "Complaint") alleges that three of the eleven named defendants breached their fiduciary duty by charging excessive management and advisement fees in violation of § 36(b) of the Investment Company Act of 1940 (the "ICA"). See 15 U.S.C. § 80a–35(b). Pursuant to Fed. R.Civ.P. 12(b)(6), defendants move to dismiss the complaint for failure to state a claim upon which relief can be granted. For the reasons stated below, defendants' motion is denied.

## BACKGROUND

Plaintiffs, individuals who purchased shares of the Fund during the class period of between July 31, 1992, the closing date of the initial offering of shares, and December 29, 1994, bring this proposed class action on behalf of themselves and all others who purchased shares in the Fund during the class period. Defendant the Fund is an "open-end," non-diversified management investment company (i.e. mutual fund) registered pursuant to the Investment Company Act of 1940. See 15 U.S.C. § 80a–8(a). According to the complaint, other defendants are: (1) DWR, a securities broker-dealer and the principal underwriter and distributor for the initial offering of the Fund; (2) Dean Witter Distributors, Inc. ("DW Distributors"), which succeeded DWR in January 1993 as principal underwriter and distributor for the continuous offering of the Fund's shares; (3) Dean Witter Intercapital, Inc., a wholly owned subsidiary of DWR, and the Manager of the Fund from January 1993 until January 1, 1994; (4) Dean Witter Services Company, Inc. ("DW Services"), a wholly owned subsidiary of Dean Witter Intercapital, which it succeeded on January 1, 1994 as Manager of the Fund; (5) TCW Funds Management, Inc. ("TCW Funds"), a California corporation which served at all relevant times as the

Fund's Investment Adviser; and (6) individual defendants who were all officers and/or trustees of the Fund.[1]

As an open-end mutual fund, the Fund conducts a continuous offering of shares, made pursuant to registration statements and prospectuses which are amended periodically. The initial prospectus was filed with the Securities and Exchange Commission on June 2, 1992, and was amended without material change two times during the class period, first on January 8, 1993, later on December 9, 1993.[2]

The Fund's prospectus (the "prospectus"), which purported to set forth all the information an investor should know before deciding to invest, stated that "[t]he investment objective of the Fund is to earn a high level of current income while maintaining relatively low volatility of principal." Affidavit of Richard A. Rosen, Esq., in Support of Defendants' Motion to Dismiss Ex. A at 2.[3] According to the prospectus, the Fund intended to achieve its investment objective by investing in fixed-income securities, the value of which "generally increase during periods of declining interest rates and decrease during periods of increasing interest rates." *Id.* at 6. Under normal circumstances, at least 65% of the total assets of the Fund were to be invested in investment grade fixed-income securities issued or guaranteed by the United States, Canadian, or Mexico governments. It was expected that "under normal circumstances, the market value dollar weighted average life . . . of the Fund's portfolio securities will be no greater than three years." *Id.* Disclosure of the expected short average life of the securities in the Fund was worthy of inclusion in the prospectus because of the fact that fluctuations in the values of fixed income securities "has historically been smaller for short term securities than for securities with longer maturities." *Id.*

A substantial portion of the 65% of the total assets of the Fund invested in investment grade fixed income securities was to be invested in United States and Canadian mortgage-backed securities. Mortgage-backed securities "are securities that directly or indirectly represent a participation in, or are secured by and payable from, mortgage loans secured by real property." *Id.* at 9. While the value of mortgage-backed securities, like that of traditional debt securities, typically increases when interest rates fall and decreases when interest rates rise, they are different from traditional debt securities in several ways, including the notable exception that the principle of the mortgages underlying the securities may be prepaid at any time. *See, id.* at 13. Normally, "prepayments on fixed rate mortgage loans will increase during a period of falling interest rates and decrease during a period of rising interest rates." *Id.* at 14.

Mortgage-backed securities have become increasingly complicated financial products, and now include among their number several mortgage derivative securities. One such product, which the Fund heavily invested in, is the collateralized mortgage obligation ("CMO"). CMOs are "debt obligations collateralized by mortgage loans or mortgage pass-through securities." *Id.* at 10. The average life of mortgage derivative securities, such as CMOs, is determined by "using mathematical models that incorporate prepayment assumptions and other factors that involve estimates of future economic and market conditions." *See* Affidavit of Robert C. Finkel, Esq., in Opposition to Defendants' Motion to Dismiss Ex. A at 13.

As stated in the prospectus, to compensate for the services and facilities furnished to the Fund and for expenses of the Fund assumed by the Manager, the Fund pays the Manager DW Services a monthly fee calculated daily by applying the annual rate of 0.39% to the

---

1. Defendant Robert A. Day was also Chairman of the Board of the Adviser for a time during the class period, and defendant Charles A. Fiumefreddo is Chairman and Chief Executive Officer of the Fund and the Manager.

2. Because the three prospectuses filed during the class period are identical in all material respects

for the purposes of this motion, for the sake of clarity, references to the "prospectus" in this Opinion and Order will be to the prospectus dated June 2, 1992.

3. The prospectus also stated that achievement of the objective was not guaranteed.

Fund's net assets. *See* Rosen Aff.Ex. A at 5. In addition, as compensation for its investment advisory services, the Funds pays the Adviser TCW Funds a monthly fee calculated daily by applying an annual rate of 0.26% to the Fund's net assets. Finally, pursuant to a Plan of Distribution, the Fund pays the distributor DW Distributors for its services a monthly fee calculated daily by applying the annual rate of 0.75% to the Fund's net assets.

## DISCUSSION

### I. *General Standard for a Rule 12(b)(6) Motion to Dismiss*

■ In deciding defendants' Rule 12(b)(6) motion to dismiss, the Court accepts as true the material facts alleged in the complaint and draws all reasonable inferences in plaintiffs' favor. *See Kaluczky v. City of White Plains,* 57 F.3d 202, 206 (2d Cir.1995) (citing *Hill v. City of New York,* 45 F.3d 653, 657 (2d Cir.1995)). A motion to dismiss must be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). Merely because recovery appears remote and unlikely on the face of a complaint is not reason for dismissal, because " ' "the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." ' " *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996) (quoting *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995) (quoting *Scheuer,* 416 U.S. at 236, 94 S.Ct. at 1686)).

---

* Editors Note: Section II is replacement text issued on August 27, 1996.

4. Count III of plaintiffs' complaint, brought against all defendants except for the Fund, alleges a violation of section 15 of the Securities Act, which states that "[e]very person who ... controls any person liable under section 11 or 12, shall also be liable jointly and severally with and to the same extent as such controlled person ... unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability

### II. *The 1933 Act Claims* *

Counts I and II of plaintiffs' complaint contain their substantive claims under the Securities Act. Count I is brought pursuant to section 11 of the Securities Act. Section 11 states that if "any part of the registration statement ... contain[s] an untrue statement of a material fact or omit[s] to state a material fact ... necessary to make the statements therein not misleading," then any person acquiring such security may sue, among others, underwriters of the security, officers of the issuer, or signers of the registration statement. 15 U.S.C. § 77k(a). Count II alleges violations of section 12(2) of the Securities Act. Section 12(2) prohibits any person from offering or selling a security "by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements ... not misleading." 15 U.S.C. § 77l (2).[4]

■ "[A] complaint may not properly be dismissed pursuant to Rule 12(b)(6) ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985) (Kearse, J.). In *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), the Supreme Court held that an omitted fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 449, 96 S.Ct. at 2132.

■ As one of several allegations in their complaint,[5] plaintiffs assert that the prospec-

---

of the controlled person is alleged to exist." 15 U.S.C. § 77o.

5. In order to find that Counts I and II of plaintiffs' complaint state claims upon which relief can be granted, the Court need only find that a single material statement was omitted from defendants' prospectus. Therefore, plaintiffs' additional allegations offered to support its §§ 11 and 12(2) claims are not analyzed in this Opinion and Order. In addition, regarding Count III of the complaint, because defendants make no arguments independent of their arguments to dismiss

tus failed to alert investors of the "maturity extension risk" inherit in the Fund's portfolio of securities, a large portion of which consists of mortgage derivative securities. A prospectus filed with the SEC and distributed to shareholders after the end of the class period stated that the Fund's investment in mortgage derivative securities subjected the Fund to extension risk, and stated that "[e]xtension risk is the possibility that rising interest rates may cause prepayments to occur at a slower than expected rate." Finkel Aff.Ex. A. at 13.[6]

 Most precisely in their reply papers supporting this motion, defendants argue that, without using the specific language "maturity extension risk" or "extension risk," the prospectus disclosed the nature, causes and consequences of such risk, and that therefore the failure of the prospectus to include plaintiffs chosen language should not impede the Court in granting the instant motion. It is true that the prospectus in several places stated that rising interest rates may cause prepayments to occur at a slower than expected rate, and the Court therefore agrees with defendants that the failure to use the term extension risk in explaining this idea is not a material omission. The Court, however, cannot conclude as a matter of law that the consequences of extension risk were disclosed in the prospectus, and finds that this alleged omission is not so "obviously unimportant to a reasonable investor that reasonable minds could not differ as to the question of [its] importance." *Goldman,* 754 F.2d at 1067. The important idea to understand in considering extension risk is not that the prepayments may occur at a slower rate during periods of rising interest rates, but rather is the consequence

of this statement, which the prospectus filed after the class period clearly articulates:

> This particular risk may effectively change a security which was considered short or intermediate-term 'at the time of purchase into a long-term security. Long-term securities generally fluctuate more widely in response to changes in interest rates than short or intermediate-term securities.

Finkel Aff.Ex. A at 13.[7] The prospectus disclosed that the principal underlying mortgage-backed securities may be prepaid at any time, that the prepayment rate generally decreases as interest rates rise, and that rising interest rates generally decrease the value of mortgage-backed securities. In addition, the prospectus disclosed that derivative mortgage securities may be extremely sensitive to changes in the interest rates. Despite these disclosures, the Court cannot conclude that the failure of the prospectus to disclose that a fund which expected to maintain a portfolio of securities with a short average life would, during times of rapidly rising interest rates, have a portfolio of securities with a much higher average life, is an omission which is immaterial as a matter of law. Thus, while the prospectus's disclosures, understood together, clearly and accurately depict the type of risk borne by the Fund, a reasonable investor could find both that the prospectus failed to disclose the extent of the risk, and that this failure significantly altered the total mix of information available.

It is true that the Fund did not, and could not, guarantee that the average life of the portfolio securities would be three years, because, as noted above, average life is determined by mathematical models which incorporate prepayment assumptions and other factors that involve estimates of future eco-

---

the first two counts, the Court does not discuss this count.

**6.** While this later prospectus defined extension risk as such, and limited its application to mortgage derivative securities, other areas of both prospectuses clearly state, and the parties assume, that the risk of prepayment is a risk common to all mortgage-backed securities.

**7.** Defendants, citing *Krouner v. American Heritage Fund, Inc.,* 1995 WL 540230, at *6 (S.D.N.Y.

Sept. 12, 1995), argue that the prospectus filed after the class period is inadmissible as evidence in this case, and that therefore plaintiffs citation to it as evidence that the prospectus did not adequately disclose the extension risk which the Fund was subject to is improper. The Court uses the later filed prospectus only as a tool to help explain the consequences of extension risk in the context of this lawsuit, and not as evidence weighing in the favor of either party.

nomic and market conditions. However, once one considers that the expected average life is determined by mathematical models, it appears that the models could also project the effect, at least .in. general terms, of an increase in interest rates on the average life of the portfolio securities.[8] The prospectus in this case did not do this, but rather simply stated that under normal circumstances the average life of the portfolio securities would be three years. The prospectus does not explain what normal circumstances are, and thus requires the investor to infer both that a reduction in the prepayment rate is not normal circumstances, and that during such time periods the statement that the Fund expects the average life of its securities to be three years no longer holds. The Court finds that a reasonable jury could conclude that by requiring investors to draw such inferences, the prospectus fails to disclose information which is not so obviously unimportant to a reasonable investor as to be immaterial as a matter of law.

Defendants are correct in arguing that the prospectus bespoke caution concerning the negative effect on a fixed-income based fund of a rise in interest rates. *See I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 763 (2d Cir.1991) (court affirms dismissal of complaint where statements in prospectus clearly bespeak caution). However, this risk is common to all fixed-income securities. The risk which the prospectus did not describe is one that is apparently limited to derivative mortgage securities—that a rapid rise in interest rates can dramatically alter the projected average life of the securities. *But cf. Jackson Nat. Life Ins. v. Merrill Lynch & Co.*, 32 F.3d 697, 703 (2d Cir.1994) (where prospectus warned of the very contingency complained of in plaintiff's complaint, prospectus bespoke caution).

Plaintiffs also point to sales materials in asserting that defendants failed to disclose the maturity extension risk inherent in the

Fund. Defendants cite to the decision of the Court of Appeals for the Second Circuit in *Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1031–32 (2d Cir.1993), as authority in this Circuit for the proposition that investors may not rely upon investment information provided by the sellers if the information is contradicted by the prospectus. While there is language in *Brown* which appears to support defendants' position, at least with respect to oral statements, other language in the opinion appears to indicate that reliance upon representations outside of the prospectus may be permissible even where the other representations are contradicted by the prospectus. *See id.* at 1032 & n. 4. Regardless, having found in this case that a reasonable investor could find that the consequences of extension risk were not adequately disclosed, the sales materials offered as proof of material misrepresentations are not necessarily contradicted by the prospectus. Therefore, the Court cannot find that statements in defendants' sales materials which state that the Fund is comprised of "government-guaranteed securities with an average life of three years or less," Complaint ¶ 66, and which state that a "fixed income portfolio with a shorter average life is generally more stable when interest rates move," *id.*, are statements that are so "obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman*, 754 F.2d at 1067. Thus, the sales material statements are not immaterial as a matter of law.

Defendants' motion to dismiss plaintiffs' consolidated class action causes of action pursuant to §§ 11, 12(2), and 15 of the Securities Act is denied.

## II. *The ICA Claim*

Count IV of plaintiffs' complaint, brought pursuant to § 36(b) of the ICA, *see* 15 U.S.C. § 80a–35(b), alleges that defendants breached their fiduciary duty by charging the Fund

---

8. It is not clear to what measure of precision such projections can be made. The parties have not discussed this issue, but rather have assumed that the effect of a rise in interest on the average life of a portfolio of mortgage derivative securities can at least be roughly quantified to an extent that it has meaning to an investor. Regardless, precise understanding of extension risk and its effect on the average life of a portfolio of securities requires a factual inquiry more suited for resolution at trial or on a motion for summary judgment.

excessive fees to compensate the Manager, the Adviser, and the Distributor. At the time relevant for the purposes of this claim, the Manager of the Fund was DW Services, the Adviser was TCW Funds, and the Distributor was DW Distributors.

■ "The standard to apply in determining whether compensation for managing a mutual fund violates the fiduciary duty imposed by section 36(b) is 'whether the fee schedule represents a charge within the range of what would have been negotiated at arm's-length in the light of all the surrounding circumstances.'" *Krinsk v. Fund Asset Management, Inc.*, 875 F.2d 404, 409 (2d Cir.1989) (quoting *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923, 928 (2d Cir.1982), *cert. denied*, 461 U.S. 906, 103 S.Ct. 1877, 76 L.Ed.2d 808 (1983)). To violate § 36(b), "'the adviser-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered.'" *Id.* (quoting *Gartenberg*, 694 F.2d at 928). The *Krinsk* Court, citing *Gartenberg*, stated that numerous factors are to be considered in determining whether or not the standard has been met, including: (1) the nature and quality of services provided to fund shareholders; (2) whether the fund benefited from economies of scale; (3) the adviser fees charged by the funds in comparison to other funds; and (4) the independence and conscientiousness of the trustees. *Id.* In assessing the nature and quality of services provided, the performance of a fund may be considered. *See Krinsk* 875 F.2d at 409. In addition, in determining whether the fund benefitted from economies of scale, the overall cost to

the manager or adviser of providing services may be considered. *See Gartenberg*, 694 F.2d at 927.

■ Plaintiffs allege that DW Services' management fee was excessive considering: (1) the actual out of pocket expenses incurred by defendants in managing the Fund; (2) management fees charged to comparable funds; (3) the lack of independence of certain trustees of the Fund; and (4) the economies of scale that should have resulted in DW Services management of other funds.[10] *See* Complaint ¶¶ 34, 35, 40, 176. If plaintiffs can provide evidence to support these factual allegations, a claim for breach of fiduciary duty pursuant to § 36(b) of the ICA will be made, and therefore dismissal is inappropriate.

Similarly, plaintiffs allege that TCW Funds' adviser fees were excessive considering: (1) the poor performance of the Fund; (2) advisement fees charged compared to other funds; (3) economies of scale; and (4) lack of independence of certain trustees. Likewise, if plaintiffs can provide evidence to support these allegations, a claim that TCW Funds breached its fiduciary duty pursuant to § 36(b) would be made, and therefore dismissal is inappropriate.

Finally, plaintiffs allege that DW Distributors' distributor fees were excessive because DW Distributors allegedly ceased actively promoting investment in the Fund during the relevant time period, and the number of shares dropped dramatically during that time period. *See* Complaint ¶ 169.[11] Because this factual allegation, if true, goes to the nature and quality of the services provided by DW Distributor, they may support a § 36(b)

---

10. Defendants argue that because the number of shareholders in the Fund decreased during the relevant time period, plaintiffs' factual allegations regarding economies of scale cannot support plaintiffs' claim. The Court notes that plaintiffs' allegation is that the overall growth of other similar funds managed by defendant does create economies of scale which should have benefitted shareholders of this Fund. While the parties did not consider this allegation in their papers in support of and in opposition to the instant motion, the Court finds plaintiffs' argument logical upon considering the purpose of allowing economies of scale to be a consideration in determining whether fees charged to shareholders is a breach of fiduciary duty.

Therefore, this allegation supports plaintiffs' claim. Regardless, the other factual allegations listed, if proven, would support the breach of fiduciary claim without any proof as to economies of scale.

11. The Fund entered into a Plan of Distribution with the Distributor pursuant to Rule 12b–1 under the ICA. *See* 17 C.F.R. § 270.12b–1. Under the Plan, the Distributor finances certain activities and services, primarily designed to promote the sale of shares of the Fund, and reimbursement to the Distributor was not to exceed the annual rate of 0.75% of the Fund's average daily net assets. *See* Rosen Aff.Ex. A. at 25.

claim. *See Krinsk*, 875 F.2d at 409. In sum, consideration of the factual allegations regarding DW Services, TCW Funds, and DW Distributor in plaintiffs' complaint, requires the Court to deny defendants' motion to dismiss the fourth count of the complaint.[12]

## CONCLUSION

For the reasons stated above, defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) is HEREBY DENIED. The parties are directed to appear at a pretrial conference in Courtroom 18B at 500 Pearl Street on June 14, 1996 at 3:00 p.m.

**SO ORDERED:**

## *OPINION ON RECONSIDERATION*

This proposed class action arises out of plaintiffs' purchase of shares in TCW/DW North American Government Income Trust (the "Fund"). Plaintiffs claim that through various registration statements, prospectuses, sales materials, annual and semiannual reports, as well as oral statements of brokers and representatives of defendant Dean Witter Reynolds, Inc. ("DWR"), all defendants misrepresented the risks inherent in the Fund, in violation of §§ 11 and 12(2) and of the Securities Act of 1933 (the "Securities Act"). *See* 15 U.S.C. §§ 77k(a) and 77*l* (2). In addition, plaintiffs assert that all defendants except the Fund, by virtue of these misrepresentations, violated § 15 of the Securities Act. *See* 15 U.S.C. § 77*o*. Finally, Count IV of the Consolidated Class Action Complaint (the "Complaint") alleges that three of the eleven named defendants breached their fiduciary duty by charging excessive management and advisement fees in violation of § 36(b) of the Investment Company Act of 1940 (the "ICA"). *See* 15 U.S.C. § 80a–35(b).

Defendants moved to dismiss the complaint for failure to state a claim upon which relief can be granted pursuant to Fed.

R.Civ.P. 12(b)(6). In an Opinion and Order dated May 8, 1996 (the "May 8 Order"), the Court denied defendants' motions, but granted several defendants' request to argue further whether or not the ICA applied to them. Currently before the Court are: (1) all defendants' motion for reconsideration of the May 8 Order; (2) plaintiffs' motion, brought pursuant to Fed.R.Civ.P. 23, for certification of this action as a class action; and (3) defendants Dean Witter Distributors, Inc.'s ("DW Distributors") and Dean Witter Services, Inc.'s ("DW Services") motion to dismiss plaintiffs' ICA cause of action. For the reasons stated below, DW Distributors' and DW Services' motion to dismiss the ICA cause of action is granted, and plaintiffs' motion for class certification is granted. Defendants' motion for reconsideration is denied insofar as it challenges the merits of the Court's May 8 Order. However, the Court, pursuant to defendants' request, amends the May 8 Order to clarify its decision. Finally, the Court addresses the remainder of plaintiffs' §§ 11, 12(2) and 15 claims not considered in the May 8 Order, and decides that while one states a claim upon which relief can be granted, the others are necessarily dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

## BACKGROUND

Because the Court addresses defendants' reconsideration motion with respect to the May 8 Order, the following background section includes facts relevant to the original motion to dismiss, and relies on documents filed in support of and in opposition to that motion. This version of the facts, however, is an abbreviated one, as the Court assumes familiarity with its prior Order. Named plaintiffs in this lawsuit are individuals who purchased shares of the Fund during the class period of between July 31, 1992, the closing date of the initial offering of shares, and December 29, 1994. Nine of the twelve named plaintiffs seek to represent the class,

---

12. Defendants assert that dismissal of the § 36(b) claims against the Manager and the Distributor is appropriate because neither is an "investment adviser" as defined in ICA § 2(a)(20). *See* 15 U.S.C. § 80a–2(a)(20). However, defendants, deeming their other arguments sufficient to prevail, elected not to argue this point in the instant

motion, and requested the right to preserve the argument for a later motion if necessary. The Court grants defendants' request, and advises defendants and plaintiffs that if papers are prepared expeditiously, the Court will consider them in conjunction with deciding plaintiffs currently pending motion for class certification.

and their names are Harry Flanagan, Steven French, Lillian Ginsberg, Phyllis Glabman, Joseph A. Gualdoni, John McCullough, John Steven McCullough, Melissa Schwartz and Bruce Stauderman.

Defendant the Fund is an "open-end," non-diversified management investment company (i.e. mutual fund) registered pursuant to the Investment Company Act of 1940. *See* 15 U.S.C. § 80a–8(a). Other defendants are: (1) DWR, a securities broker-dealer and the principal underwriter and distributor for the initial offering of the Fund; (2) DW Distributors, which succeeded DWR in January 1993 as principal underwriter and distributor for the continuous offering of the Fund's shares; (3) Dean Witter Intercapital, Inc., a wholly owned subsidiary of DWR, and the Manager of the Fund from January 1993 until January 1, 1994; (4) DW Services, a wholly owned subsidiary of Dean Witter Intercapital, which it succeeded on January 1, 1994 as Manager of the Fund; (5) TCW Funds Management, Inc., a California corporation which served at all relevant times as the Fund's Investment Adviser; and (6) individual defendants who were all officers and/or trustees of the Fund.

As an open-end mutual fund, the Fund conducts a continuous offering of shares, made pursuant to registration statements and prospectuses which are amended periodically. The initial prospectus was filed with the Securities and Exchange Commission on June 2, 1992, and was amended without material change two times during the class period, first on January 8, 1993, and later on December 9, 1993.[1]

The Fund's prospectus (the "prospectus"), which purported to set forth all the information an investor should know before deciding to invest, stated that "[t]he investment objective of the Fund is to earn a high level of current income while maintaining relatively low volatility of principal." Affidavit of Richard A. Rosen, Esq., Sworn to on July 20, 1995, in Support of Defendants' Motion to Dismiss Ex. A at 2.[2] According to the prospectus, the Fund intended to achieve its investment objective by investing in fixed-income securities, the value of which "generally increase during periods of declining interest rates and decrease during periods of increasing interest rates." *Id.* at 6. Under normal circumstances, at least 65% of the total assets of the Fund were to be invested in investment grade fixed-income securities issued or guaranteed by the United States, Canadian, or Mexican governments. It was expected that "under normal circumstances, the market value dollar weighted average life . . . of the Fund's portfolio securities [would] be no greater than three years." *Id.* Disclosure of the expected short average life of the securities in the Fund was worthy of inclusion in the prospectus because of the fact that fluctuations in the values of fixed income securities "has historically been smaller for short term securities than for securities with longer maturities." *Id.* A substantial portion of the 65% of the total assets of the Fund invested in investment grade fixed income securities was to be invested in United States and Canadian mortgage-backed securities. One kind of mortgage-backed security in which the Fund invested is the collateralized mortgage obligation ("CMO"). The prospectus stated that the Fund's investment in Mexican government issued debt would be limited to four different types of securities, all of which are traded on the Mexican Stock Exchange. *See id.* at 8.

To compensate for the services and facilities furnished to the Fund and for expenses of the Fund assumed by the Manager, the Fund pays the Manager DW Services a monthly fee calculated daily by applying the annual rate of 0.39% to the Fund's net assets. *See id.* at 5. In addition, as compensation for its investment advisory services, the Funds pays the Adviser TCW Funds a monthly fee calculated daily by applying an annual rate of 0.26% to the Fund's net assets. Finally, pursuant to a Plan of Distribution, the Fund

---

1. Because the three prospectuses filed during the class period are identical in most material respects for the purposes of this motion, unless otherwise stated, references to the "prospectus" in this Opinion and Order will be to the prospectus dated June 2, 1992.

2. The prospectus also stated that achievement of the objective was not guaranteed.

pays the distributor DW Distributors for its services a monthly fee calculated daily by applying the annual rate of 0.75% to the Fund's net assets.

## DISCUSSION

### I. *Reconsideration*

The standard for granting a motion for reconsideration is strict, and such a motion will "generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995).

Defendants first basis for seeking reconsideration of the May 8 Order is that the Court failed to refer to, let alone adhere to, an earlier decision of this Court. *See In re Hyperion Sec. Litigation,* 1995 WL 422480 (S.D.N.Y. July 14, 1995) (Mukasey, J.). First, the Court notes that the *Hyperion* decision is not a controlling decision, and therefore cannot properly support a motion for reconsideration. Moreover, the Court did in fact give careful consideration to Judge Mukasey's decision in the *Hyperion* case, but found the instant case distinguishable. It is true that Judge Mukasey granted a motion to dismiss for failure to state a claim where the prospectus at issue, like the Fund's prospectus in this case, made no mention of maturity extension risk when disclosing risks associated with mortgage-backed securities such as CMOs. However, considering that there is no mention of the concept of maturity extension risk in the *Hyperion* decision, it does not necessarily follow that Judge Mukasey considered the failure to disclose such risk immaterial. It is equally plausible to conclude that maturity extension risk was never raised by the parties in the *Hyperion* case, and therefore never considered by the *Hyperion* Court. Regardless, even if maturity extension risk were considered by the *Hyperion* Court, because this Court is not bound by that decision, it maintains its earlier position that failure to disclose such risk is not immaterial as a matter of law.

In the earlier Order, the Court addressed only a single group of statements which the Fund's prospectus failed to disclose—statements concerning maturity extension risk. Upon finding that adequate disclosure of this risk was not immaterial as a matter of law, the Court denied defendants' Rule 12(b)(6) motion to dismiss plaintiffs' causes of actions based upon §§ 11, 12(2), and 15 of the Securities Act. In their memorandum of law in support of their motion for reargument, defendants correctly state that plaintiffs' complaint identifies other allegedly material misrepresentations and omissions in the prospectus.[3] While aware that the May 8 Order expressly declined to consider these other alleged misrepresentations and omissions, *see* May 8 Order at 7 n. 5, observing that the Court may grant a Rule 12(b)(6) motion in part and deny it in part, defendants now asks the Court to analyze plaintiffs' other allegations. Defendants argue that a decision as to whether the other allegations state a claim would not be a mere academic exercise because dismissal of any of these claims would limit the scope of discovery.

The Court agrees that, if possible, reducing the number of claims alleged would provide efficiency benefits for the parties to this litigation, and therefore grants defendants' request. Based on its reading of the complaint, the Court finds that plaintiffs' assert three other claims resulting from disclosures in or omissions from the prospectus. Specifically, plaintiffs allege that disclosures about (1) investments in Mexican government debt securities and (2) the Fund's stated investment objective to earn a high level of current income while maintaining a relatively low volatility of principle, constitute material misstatements in violation of §§ 11, 12(2) and 15 of the Securities Act. In addition, the complaint appears to allege that the prospectus's failure to disclose the alleged inherent illiquidity of the CMO market constitutes material omissions in violation of the same laws.

---

3. While plaintiffs' complaint does allege various misrepresentations and omissions, the complaint only pleads a single cause of action for violation of § 11, a single cause of action for violation of § 12(2), and a single cause of action for violation of § 15.

As detailed in the May 8 Order, § 11 states that if "any part of the registration statement ... contain[s] an untrue statement of a material fact or omit[s] to state a material fact ... necessary to make the statements therein not misleading," then any person acquiring such security may sue, among others, underwriters of the security, officers of the issuer, or signers of the registration statement. 15 U.S.C. § 77k(a). Section 12(2) prohibits any person from offering or selling a security "by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements ... not misleading." 15 U.S.C. § 77l (2).[4] A misrepresented or omitted fact is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding whether to invest. *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); *Folger Adam Co. v. PMI Indus., Inc.*, 938 F.2d 1529, 1532 (2d Cir.1991). In other words, a fact is material if it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC*, 426 U.S. at 449, 96 S.Ct. at 2132.

A plaintiff pleading a violation of § 11 need not allege that she relied on the alleged material misrepresentation or omission. *See Westinghouse Elec. Corp. v. '21' Int'l Holdings, Inc.*, 821 F.Supp. 212, 218 (S.D.N.Y. 1993). Rather, the plaintiff need only plead that she purchased securities which were issued and sold pursuant to a defective registration statement (which includes a prospectus). *See Barnes v. Osofsky*, 373 F.2d 269, 271 (2d Cir.1967); *Klein v. Computer Devices, Inc.*, 591 F.Supp. 270, 273 (S.D.N.Y. 1984). As in a § 11 claim, a plaintiff need not plead reliance to state a claim under § 12(2). *See Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124, 1126 (2d Cir.1989); *Wigand v. Flo–Tek, Inc.*, 609 F.2d 1028, 1034 (2d Cir.1979); *Polycast Technolo-*

gy Corp. v. Uniroyal, Inc., 792 F.Supp. 244, 259 (S.D.N.Y.1992). Indeed, a plaintiff need not even prove that she received the prospectus before purchasing shares to recover under § 12(2). *See Klein v. Computer Devices, Inc.*, 591 F.Supp. 270, 277 (S.D.N.Y.1984). Rather, the plaintiff must simply prove that defendants sold the security "by means of a prospectus or oral communication." However, under both § 11 and § 12(2), if the defendant proves that the plaintiff knew of the material misstatement or omission, then no liability will attach. *See* 15 U.S.C. § 77k(a); 15 U.S.C. § 77l (2); *Mayer v. Oil Field Sys. Corp.*, 803 F.2d 749, 755 (2d Cir.1986).

Regarding the Mexican government debt securities, plaintiffs first allege that the prospectus failed to fully disclose the risks of investing in peso-denominated securities. *See* Complaint ¶¶ 124–141. The prospectus did disclose, however, various risk factors regarding investing in Mexican government debt securities, including: (1) the high levels of inflation, large amounts of government debt and political and social uncertainties in Mexico, *see* Prospectus at 3; (2) that fluctuations in the relative rates of exchange among the currencies of the United States and Mexico will impact the Fund's total return on the Mexican-currency denominated assets, *see id.* at 14; and (3) the potential and unpredictable impact of the Mexican government on the yield from Mexican debt obligations, *see id.* at 15. The Court finds that, based upon these disclosures, the level of risk associated with investing in Mexican debt securities was adequately disclosed in the prospectus. Plaintiffs' complaint identifies no misstatements or omissions in the prospectus concerning the riskiness of investing in these securities which a reasonable investor would find important in making an investment decision. Therefore, any misstatements or omissions are immaterial as a matter of law. *See Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985) (Kearse, J.).

---

4. Count III of plaintiffs' complaint, brought against all defendants except for the Fund, alleges a violation of § 15 of the Securities Act. Section 15 states that "[e]very person who ... controls any person liable under section 11 or 12, shall also be liable jointly and severally with and to the same extent as such controlled person ...

unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." 15 U.S.C. § 77o. Liability under § 15 is therefore derivative of liability under §§ 11 and 12(2).

Plaintiffs' other claim with respect to the Fund's investment in Mexican government debt securities is that the prospectus was misleading in that it indicated that investment in peso-denominated debt securities would be balanced with investment in lower risk dollar-denominated debt securities. In fact, the Fund invested almost exclusively in peso-denominated debt securities, and that investment was negatively impacted by the substantial devaluation of the peso during the class period. Again, however, the Court does not find a material misstatement or omission in the prospectus with respect to this issue. Put simply, nowhere in the prospectus does it state that a goal of the Fund would be to balance peso-denominated Mexican debt with dollar-denominated Mexican debt. In fact, the prospectuses dated June 2, 1992 and January 8, 1993 both stated that "[c]urrently there are no Mexican Government Securities denominated in the U.S. dollar which qualify for investment in the Fund. If qualified investments of this type appear in the future, the Fund will consider them for investment." Consistent with this statement, during those time periods no U.S.-denominated Mexican debt was owned by the Fund.

It is true that the language stating that no dollar-denominated Mexican debt securities qualified for investment was removed from the December 9, 1993 prospectus, and it is also true that an investment in such securities was both made and liquidated in 1994. However, these facts do not bear on the basic point, which is that the prospectus did not imply any balance between dollar-denominated and peso-denominated securities, but rather left decisions to balance, or not balance, investment in these securities to the discretion of the Advisor. *See* Prospectus at 9. Mere identification in the prospectus of various types of Mexican debt securities, in-

cluding dollar-denominated securities, could not create an impression with a reasonable investor that these debts would be owned by the Fund in any particular relative quantity. Therefore, because there was no material misstatement with respect to investment in peso-denominated, versus dollar-denominated, Mexican debt securities, plaintiffs' §§ 11, 12(2) and 15 claims as to this issue are dismissed.[5]

According to the prospectus, the "investment objective [of the Fund] is to earn a high level of current income while maintaining relatively low volatility of principal." Prospectus at 1. For several reasons, the Court does not find this statement actionable under the securities laws. First, the statement does not make a promise, but rather announces the goal of the Fund. Forward-looking statements which do not make a promise to investors, but rather only state objectives, are not actionable under the securities laws. *See Lasker v. New York State Elec. & Gas Corp.,* 1995 WL 867881, at *9 (E.D.N.Y. Aug. 22, 1995) (broad descriptions of goals of company not actionable as no reasonable investor would rely upon them), *aff'd,* 85 F.3d 55 (2d Cir.1996); *Heil v. Lebow,* 1994 WL 637686, at *5 (S.D.N.Y. Nov. 14, 1994) (Keenan J.) (statements of opinion that express no guarantee do not support a cause of action under the securities laws), *aff'd,* 1995 WL 736327, at *1 (2d Cir. Dec. 12, 1995). Even if some forward-looking statements of opinion were actionable, general and indefinite statements such as the instant statement of investment objective are not actionable. *See San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Co., Inc.,* 75 F.3d 801, 811 (2d Cir.1996) (Newman, C.J.) (statements that company "should deliver income growth consistent with its historically superior perfor-

---

**5.** Defendants', in their memorandum of law in support of reargument, also ask the Court to dismiss plaintiffs' claim that, due to the high annual fees charged by defendants, the Fund needed to speculate "in high risk derivatives and no the direction of the Mexican peso." Complaint ¶ 5. Specifying this allegation, the complaint cites to defendants' liquidation of its investment in dollar-denominated Mexican debt in 1994, and its subsequent further investment in peso-denominated securities. *See id.* ¶ 6. To the

extent that this claim is separate from the claim that the Fund failed to balance adequately its investment in Mexican debt between peso-denominated and dollar denominated securities, it too is dismissed. Sections 11 and 12(2) claims are based upon material misstatements or omissions, and plaintiffs can point to no such misstatement or omission in the prospectus or other offering document, nor any oral statement or omission, to support this claim.

mance" and "we are optimistic about 1993" are non-actionable puffery statements). The Court finds that the Fund's investment objective is simply not the kind of statement which a reasonable investor would consider important in deciding whether or not to invest.[6] Indeed, if it were reasonable for an investor to consider such a statement, the Court presumes that many, if not most securities offerings would expose their issuers to federal securities law liability. Plaintiffs' causes of action alleging that the investment objective announced in the prospectus constituted a material misstatement are dismissed.

Plaintiffs' complaint also alleges that failure to disclose the inherent illiquidity of the market for CMOs was a material omission. Defendants argue that such disclosure was made by pointing to a sentence, in the section of the prospectus labeled "Determination of Net Value," that states in relevant part: "When market quotations are not readily available, including circumstances under which it is determined by the Adviser that sale or bid prices are not reflective of a security's market value, portfolio securities are valued at their fair value...." Prospectus at 24. While this sentence makes a general observation about all securities in the Fund, because it neither specifically refers to, or even suggests reference to, CMOs, nor discusses illiquidity explicitly, the Court cannot conclude as a matter of law that it constitutes adequate disclosure of the alleged inherent illiquidity of the CMO market. Therefore, unless no reasonable investor would find disclosure of this alleged omission important in making an investment decision, defendants' motion to dismiss this claim must be denied.

The Court does not consider failure to disclose adequately the allegedly inherent illiquidity of the CMO market to be immaterial as a matter of law. Defendants argue that failure to disclose the alleged illiquidity of the CMO market cannot be a material omission because there is a risk of illiquidity in any market. While it is true, as defendants argue, that there is a risk of illiquidity

in any market, such truth does not render the instant omission necessarily immaterial because there may well be illiquidity risks particular to the CMO market which a reasonable investor would want to know about before investing. More particular information about the CMO market is necessary to make this determination, meaning that discovery is needed, and denial of the instant Rule 12(b)(6) motion is appropriate.

Finally, in their motion for reconsideration, defendants contend that certain statements in the May 8 Order indicate that the Court decided ultimate issues of materiality as to certain omissions regarding maturity extension risk. Because it was deciding a motion to dismiss, where the factual allegations of the complaint are taken as true for the purposes of the motion, the Court intended only to conclude that the failure to disclose maturity extension risk in the prospectus was not, as a matter of law, immaterial. Therefore, in order to clarify any confusion, the Court now issues a separate order which amends its May 8 Order.

## II. *Certification of the Class*

In determining whether or not a class should be certified by a district court, the following threshold requirements must be met:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). The plaintiff bears the burden of proof in establishing that the prerequisites for a class action are met. *See Bishop v. New York City Dep't of Hous. Preservation & Dev.*, 141 F.R.D. 229, 234 (S.D.N.Y.1992). If each of these prerequisites is satisfied, plaintiff must then show that its putative class fits within one of the

---

**6.** The Court notes that its finding here is consistent with its earlier finding that plaintiffs' stated a claim by alleging that defendants' failed to adequately disclose the maturity extension risk related to CMOs. The characterization of a debt security as either a long or short term security is a characterization which a reasonable investor might consider important.

three subsections listed in Rule 23(b). Because of "the importance of the class action device in securities fraud suits, these factors are to be construed liberally." *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 179 (2d Cir.1990), *cert. denied*, 498 U.S. 1025, 111 S.Ct. 675, 112 L.Ed.2d 667 (1991).

Defendants concede that the first two prerequisites of Rule 23(a) are met in this case. Rule 23(a)(1) is satisfied as the class contains over 80,000 members. *See Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir.) (numerosity presumed at a level of 40 members), *cert. denied*, —— U.S. ——, 115 S.Ct. 2277, 132 L.Ed.2d 2277 (1995). Because the remaining claims in this case are based upon alleged omissions either in the prospectus or by DWR brokers selling shares in the Fund pursuant to the prospectus, the Court find that the Rule 23(a)(2) commonality test is also met. "The key inquiry of Rule 23(a)(2) is whether the plaintiffs' claims arise from a common nucleus of facts. Such cases are considered particularly appropriate for class action treatment." *David v. Showtime/The Movie Channel, Inc.*, 697 F.Supp. 752, 756 (S.D.N.Y.1988).

In this case, defendants' main argument to support their position that the Court should not certify the proposed class is that plaintiffs have failed to establish, as required by Rule 23(a)(4), that the proposed representatives will fairly and adequately protect the interests of the class. "The question of whether the named plaintiffs can fairly and adequately represent the class is one 'committed to the sound discretion of the district court.'" *County of Suffolk v. Long Island Lighting Co ("LILCO")*, 710 F.Supp. 1407, 1413 (E.D.N.Y.1989) (Weinstein, J.), *aff'd*, 907 F.2d 1295 (1990) (quoting *Malchman v. Davis*, 761 F.2d 893, 899 (2d Cir.1985)). Courts typically analyze whether the requirements of Rule 23(a)(4) have been met by considering whether (1) the plaintiffs' interests are not antagonistic to the interests of other members of the class and (2) plaintiffs' attorneys are qualified, experienced and able to conduct the litigation. *See In re Joint E. and S. Dist. Asbestos Litigation*, 78 F.3d 764, 778 (2d Cir.1996). The Court finds both of these considerations satisfied, and defendants do not contend otherwise.

Defendants do, however, offer a Rule 23(a)(4) representative adequacy challenge based upon a line of cases which require a representative plaintiff "to demonstrate a thorough familiarity with the underlying basis for his cause of action." *Kamerman v. Steinberg*, 113 F.R.D. 511, 517 (S.D.N.Y. 1986). Defendants contend that deposition testimony reveals that the proposed representatives show a "woeful lack of knowledge and understanding about the basic claims and allegations in the Complaint," and "a failure to read the prospectus at issue—even in connection with preparation of the complaints in their name." Defendants' Opposition to Plaintiffs' Motion for Class Action Certification at 4. They argue that if representatives lack familiarity with the case they will be unable to supervise their counsel during the litigation, and are thus inappropriate as representatives. *See id.* (citing *In re Marion Merrell Dow Inc. Sec. Litig.*, 1994 WL 396190, at *8 n. 4 (W.D.Mo.1994)); *see, e.g.*, *Darvin v. International Harvester Co.*, 610 F.Supp. 255, 257 (S.D.N.Y.1985). The cases supporting this approach suggest that the motivation behind requiring representative plaintiffs to demonstrate great familiarity with the case is a fear that the representatives, during pretrial discovery and at trial, will give misleading and contradictory testimony with regard to basic issues in the case that might make their claims subject to unique defenses. *See LILCO*, 710 F.Supp. at 1416; *Darvin*, 610 F.Supp. at 257. Thus, in that situation, the challenge to class certification can alternatively be viewed as a challenge to the representative plaintiffs' compliance with the typicality requirement of Rule 23(a)(3).[7]

While familiar with the authority cited by defendants which finds a plaintiff without detailed knowledge of the underlying suit to be inappropriate as a class representative,

---

7. Indeed, as will be discussed *infra*, defendants' challenge the certification of several proposed representatives on Rule 23(a)(3) grounds.

the Court notes that many other courts, especially in complex securities fraud cases such as this one, do not impose such a requirement. *See Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 201 (S.D.N.Y.1992) (detailed knowledge of which acts create liability in Rule 10b–5 action not required of class representative); *Trautz v. Weisman*, 846 F.Supp. 1160, 1168 (S.D.N.Y.1994) (in RICO case, plaintiff whose deposition testimony revealed an extremely limited understanding of (1) the RICO statute, (2) facts asserted in complaint, and (3) his role as a class representative, found to be adequate representative). As Judge Weinstein, a preeminent scholar who has written books and articles on class actions, as well as presided over many high-profile class action cases, noted in the *LILCO* case, "in the context of complex securities litigation, attacks on the adequacy of the class representative based on the representative's ignorance ... are rarely appropriate." *LILCO*, 710 F.Supp. at 1416 (citing *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 370–74, 86 S.Ct. 845, 849–52, 15 L.Ed.2d 807 (1966)). Judge Weinstein further stated that in complex actions "named plaintiffs are not required to 'have expert knowledge of all the details of the case ... and a great deal of reliance on expert counsel is to be expected.'" *Id.* (quoting *In re AM Int'l, Inc. Sec. Litig*, 108 F.R.D. 190, 197 (S.D.N.Y.1985)). Thus, in complex securities fraud cases, this Court is in agreement with "the recent trend in this district to assess the adequacy of the representative's attorney rather than the personal qualification of the named plaintiff." *Klein v. A.G. Becker Paribas Inc.*, 109 F.R.D. 646, 651 (S.D.N.Y.1986).

Based on this authority, the Court will not deny any proposed representative's motion for certification solely because their lack of knowledge about the case makes them unable to supervise their attorney. In complex securities fraud cases, the approach suggested by defendants would limit class representative status to sophisticated investors who also have strong knowledge of the securities laws, as only they could adequately supervise their attorneys. Yet, one purpose of class

actions lawsuits is to allow individuals, whose damages claims are less than the costs of litigating the action individually, an opportunity to vindicate their rights in court while spreading the costs of pursuing the action across the class. *See, e.g., Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99–100 n. 11, 101 S.Ct. 2193, 2199–2200 n. 11, 68 L.Ed.2d 693 (1981). In securities fraud cases, those with small damages claims will often be the smaller, less sophisticated investor. Therefore, limiting representative status to plaintiffs who could adequately supervise their counsel is counter to a fundamental goal of class action lawsuits. Once this is conceded, and therefore it is conceded that ability to supervise counsel should not be required of a class representative, at least for Rule 23(a)(4) adequate representative purposes, there is no reason to draw distinctions between proposed representatives with detailed knowledge and understanding of the case, from proposed representatives with moderate or limited knowledge.[8] A more appropriate consideration with respect to individual representatives is whether or not they have shown a willingness to pursue actively the litigation by participating in discovery and staying abreast of the litigation as it proceeds. *Cf. Darvin*, 610 F.Supp. 255, 257 (S.D.N.Y.1985) (failure to comply with reasonable discovery requests is indication that individual is not suitable as a class representative). In this case there is no evidence before the Court that any of the proposed class representatives have been unwilling to actively participate in this litigation, and all representatives have a basic understanding of their claims in this case. Moreover, the Court has high regard for and confidence in both the lead class counsel and other counsel representing this class, and finds no evidence of antagonism between any of the proposed representatives. In short, the Court finds that the interests of the class are adequately represented, and therefore finds Rule 23(a)(4) is satisfied as to all proposed representatives.

---

**8.** In other words, even if plaintiffs in this case had a markedly better understanding of the prospectus and their own complaint than defendants assert they do, it is not clear to the Court that this knowledge would allow them to supervise their attorneys in a meaningful way.

342

Beyond challenging all plaintiffs on Rule 23(a)(4) grounds, defendants also challenge certification of four of the proposed representative plaintiffs by asserting that their claims are not typical of the rest of the class, and are therefore subject to unique defenses. The typicality requirement of Rule 23(a)(3) "is satisfied when each class member's claim arises from the same course of events, and each class member makes a similar legal argument to prove the defendant's liability." *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 291 (2d Cir.1992). Moreover, the mere presence of questions unique to the class representatives will not bar class certification. *See Gary Plastic,* 903 F.2d at 180. Only if these questions subject the class representative "to unique defenses which threaten to become the focus of the litigation," *id.,* is denial of certification appropriate.

Based upon the proof necessary to sustain claims pursuant to §§ 11 and 12(2), and based upon the alleged material omissions remaining in this case, the Court finds that plaintiffs' Bruce Stauderman, Joseph Gualdoni, John McCullough and John Steven McCullough should not be denied representative status because unique defenses particular to each of these individuals do not threaten to become the focus of the litigation. The evidence presented by defendants show that these plaintiffs had a greater understanding of the characteristics of the securities of the Fund, including in some cases pre-investment knowledge that there would be some volatility in principle. However, when one considers the liability requirements for § 11 and 12(2) claims, as discussed in Part I of this Order, it is clear that this knowledge by these defendants will not create defenses unique that threaten to become the focus of this litigation. Based on the evidence pres-

ently before the Court,[9] there is no indication that any of these defendants had knowledge *prior to investing* of the remaining alleged omissions in this case. Thus, this defense, offered by the language of §§ 11 and 12(2), appears unavailable in this case. The Court finds the Rule 23(a)(3) typicality requirement satisfied in this case.[10]

Addressing the final issue relevant to class certification, because the Court also finds that the requirements of Rule 23(b)(3) have been met in this case, the Court grants plaintiffs' motion for certification. Rule 23(b)(3) states:

[A]n action may be maintained as a class action if the prerequisites of subdivisions (a) are satisfied, and in addition:

(3) the Court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3). In this case, common questions of law concerning the adequacy of disclosure in the prospectus of certain facts about CMOs predominate. Moreover, a class action is the superior method of adjudicating

9. The Court notes that Rule 23 provides that any order certifying a class "may be conditional, and may be altered or amended before the decision on the merits." Fed.R.Civ.P. 23(c)(1). Therefore, if, as this action proceeds, the evidence reveals that unique defenses as to particular representatives do emerge, the Court will consider de-certifying particular representatives, or the class as a whole, as appropriate.

10. Defendants also proffer evidence that oral sales presentations from defendants' brokers to proposed representatives were not uniform, or in

some cases non-existent, and therefore certification of the class is inappropriate because Rule 23(a)(3)'s typicality requirement is not met. Again, however, plaintiffs need not prove that they relied on the statements of their brokers, and, assuming *arguendo* that material omission are proven, defendants may avoid liability only by showing that plaintiffs knew of the alleged omissions prior to investing. Review of the deposition testimony does not indicate that any plaintiff was informed by his or her broker of the alleged omissions.

the controversy, where it appears that many plaintiffs in this large class will have relatively small claims at stake.

### III. *The Investment Company Act*

The May 8, 1996 Order denied defendants' Rule 12(b)(6) motion to dismiss plaintiff's ICA cause of action, but permitted defendants DW Services and DW Distributors [11] to file supplemental briefs in further support of a motion to dismiss on grounds not covered in the prior submissions. *See* Order at 15 n. 12. DW Services and DW Distributors have filed such briefs in support of their motion, and plaintiffs who bring the ICA cause of action, Phyllis Glabman, Henry F. Flanagan, and Lillian Ginsberg, have opposed the motion. In addition, plaintiffs request that, if defendants' motion is granted, they be granted leave by the Court to assert derivative claims on behalf of the Fund, pursuant to Fed.R.Civ.P. 23.1, alleging excessive compensation to these two defendants. Having considered the supplemental briefing, the Court grants DW Services' and DW Distributors' motion to dismiss, and denies plaintiffs motion to amend their complaint by asserting derivative claims.

Section 36(b) of the ICA provides in relevant part:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company ... to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection ... against any such investment adviser, or any affiliated person of such investment adviser, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments.

15 U.S.C. § 80a–35(b). Among the persons enumerated in subsection (a) is the "principal underwriter, if such registered company is an open-end [mutual fund]." 15 U.S.C.

§ 80a–35(a). The language of § 36(a) shows that an affiliate of an investment advisor or an underwriter may be liable for a violation of § 36(b). However, the "right of action under section 36(b) is limited by its language and its intent to recovery of *investment advisory fees* from any party enumerated in either section 36(b) or section 36(a)." *Jerozal v. Cash Reserve Management, Inc.,* 1982 WL 1363, at *6 (S.D.N.Y. August 10, 1982) (emphasis added); *see Halligan v. Standard & Poor's/Intercapital, Inc.,* 434 F.Supp. 1082, 1085 (E.D.N.Y.1977). In other words, when § 36(b) details a fiduciary duty with respect to "compensation for services," the services referred to are investment adviser services. In their complaint, plaintiffs allege that DW Distributors was compensated "at an annual rate of 0.75% of the average daily net assets of the Fund for specific expenses incurred in promoting the sale and distribution of the Fund's shares." Complaint ¶ 16. In. addition, the Complaint alleges that DW Services received a monthly fee at the annual rate of 0.39% of the Fund's daily net assets for "managing the Fund's affairs, supervising its day to. day operations and providing administrative services." . Complaint ¶ 18. The complaint does not allege that either DW Distributors or DW Services ever received compensation for investment advisory services. Therefore, as to these two defendants, the Court dismisses plaintiffs' fourth cause of action brought pursuant to § 36(b) of the ICA.

Derivative claims are brought pursuant to Fed.R.Civ.P. 23.1, and Rule 23.1 states that a derivative complaint shall:

> [A]llege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the director or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort.

Because plaintiffs' have neither proffered any evidence that they have requested the trust-

---

**11.** While defendant DW Intercapital also moved to dismiss plaintiff's ICA cause of action, plaintiffs have clarified that they do not assert any claim under the ICA against DW Intercapital.

*See* Plaintiff's Memorandum of Law in Opposition to the Dean Witter Defendants' Motion to Dismiss Plaintiffs' Claim Under the ICA at 2 n. 2.

ees of the Fund to pursue these excessive fees claims, nor proffered any explanation for why such an effort has not been made, the amendment to the complaint would be futile. The Court therefore denies plaintiffs' motion to amend their complaint to add derivative claims on behalf of the Fund for excessive fees. *See Richardson Greenshields Sec., Inc. v. Lau*, 825 F.2d 647, 653 n. 6 (2d Cir.1987).

## CONCLUSION

For the reasons stated above, defendants' motion for reconsideration is HEREBY DENIED. The May 8 Order in this case is HEREBY AMENDED. In addition, all of plaintiffs' claims not considered in the May 8 Order, upon consideration, are HEREBY DISMISSED, except for the claim concerning inherent illiquidity in the CMO market. Plaintiffs' ICA cause of action against defendants DW Distributors and DW Services is HEREBY DISMISSED, and plaintiffs' motion to amend their complaint is HEREBY DENIED. Plaintiffs' motion for class certification is HEREBY GRANTED. The parties shall appear for a pre-trial conference in Courtroom 18B, 500 Pearl Street, on October 4, 1996 at 3:00 p.m.

**SO ORDERED.**